## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THOMAS COSTELLO,

    *Plaintiff*,

*v.*                      CASE NO. 2:13-CV-12138

CAROLYN W. COLVIN         DISTRICT JUDGE LAWRENCE P. ZATKOFF
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 12.)

Plaintiff Thomas Costello was fifty-eight years old at the time of the most recent administrative hearing. (Transcript, Doc. 5 at 40.) Plaintiff taught in Saginaw Public Schools from 1977 until 1995 and was an administrator in the Benito Juarez Academy in 1996. (Tr. at 171.) He worked full-time as a teacher in the Flint Community Schools system from 1997 until 2004, and then as an assistant principal in the same system from 2004 until 2009. (Tr. at 159.) Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.*, on December 1, 2009, alleging that he became unable to work on April 2, 2009. (Tr. at 132.)

The claim was denied at the initial administrative stage. (Tr. at 77.) In denying Plaintiff's claims, the Commissioner considered fractures of the lower limbs and affective disorders as possible bases for disability. (*Id.*) On May 4, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Peter N. Dowd, who considered the application for benefits de novo. (Tr. at 35-76.) In a decision dated December 13, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 18, 28.) Plaintiff requested a review of this decision on January 24, 2012. (Tr. at 12-13.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 13, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On May 15, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory

authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105. The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that

the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the

4

courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two

programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

6

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2014 and had not engaged in substantial gainful activity since April 2, 2009, the alleged onset date. (Tr. at 19.) At step two, the ALJ found that Plaintiff's history of left trimalleolar ankle fracture was a severe impairment under 20 C.F.R. § 404.1520. (Tr. at 20-23.) The ALJ also concluded that Plaintiff's depression was not a severe impairment. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 23-24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 26.) The ALJ also found that Plaintiff was fifty-five years old on the alleged disability onset date, which put him in the "advanced age" category under 20 C.F.R. § 404.1563. (Tr. at 27.) At step five, the ALJ found that Plaintiff had acquired skills from past relevant work transferable

to other jobs that existed in significant numbers in the regional economy. (Tr. 27-28.)

### E.    Administrative Record

### a.    Physical Impairments

Plaintiff broke his ankle in three places–a trimalleolar ankle fracture–on April 2, 2009 while breaking up a fray on the school grounds where he worked. (Tr. at 184, 212, 252, 270.) A student pushed him down, breaking the ankle on the fall, while he protected the assistant principal from assault. (Tr. at 270.) The emergency room physician found him in moderate distress. (Tr. at 220.) X-rays revealed the trimalleolar fracture with dislocation of the tibiotalar joint and extensive soft tissue deformity. (Tr. at 222.) More x-rays were ordered after Plaintiff received a plaster splint. (Tr. at 224.) The radiologist noted reduction of the fracture and that the major fracture fragments were "in good position and alignment . . . ." (Tr. at 225.) Similar examinations of his knees showed no abnormalities. (Tr. at 226.)

Plaintiff's primary physician was Dr. Kevin T. Snyder. (Tr. at 217.) It does not appear that Dr. Snyder treated the ankle injury and, at the time of the hearing, neither he nor any other physician had prescribed pain medication for Plaintiff. (Tr. at 205, 247) Instead Dr. Snyder referred Plaintiff to Dr. Susan Mosier-LaClair for surgery. (Tr. at 247.) On a pre-operation visit, she assessed the trimalleolar fracture and also his tibiofibular joint dislocation. (Tr. at 252.) She explained to Plaintiff that his ankle could be "easily treated with an outpatient surgery" lasting less than an hour. (*Id.*) "He may never feel 100%," she added, "but most patients achieve at least 80 if not 90% or better function and return to all their regular activities with no significant restrictions or discomfort. However, it may always be a little achy and swollen . . . ." (*Id.*) Estimated recovery time for this procedure was six months to a year, and physical therapy was generally

recommended. (Tr. at 252-53.) He had a five to ten percent chance, at the most, of developing posttraumatic arthritis from the fractures. (*Id.*)

On April 21, 2009, Dr. Mosier-LaClair led Plaintiff's surgery–an open reduction and internal fixation of the trimalleolar ankle fracture and distal tibiofibular joint dislocation. (Tr. at 228.) The surgeons placed screws and a plate in his left ankle and applied another plaster splint when finished. (Tr. at 229.) On discharge, he received a prescription for hydrocodone. (Tr. at 219.) Two weeks later, on May 1, he returned for his first check-up, which showed that the incisions were "well-healed" and the swelling was within normal bounds. (Tr. at 243-44.) On the May 28 exam, Dr. Mosier-LaClair reported that Plaintiff "has been doing great in a short-leg non-walking cast. . . . Tom's incisions are well[-]healed. His swelling is appropriate. He has neutral alignment of the ankle." (Tr. at 242.) Overall, he was "doing great" and could return to work in August. (*Id.*)

Plaintiff was still "doing great" during the next appointment on June 28. (Tr. at 241.) He could begin physical therapy and, "if he [was] feeling over 80% better" during the check-up in two months, Dr. Mosier-LaClair declared that "we can call it our final visit." (*Id.*) That next visit was not the last, but her examinations results came back normal–his ankle range of motion was "coming along," his hindfoot range of motion was eighty to ninety percent of normal, and he had no ankle instability. (Tr. at 240.) He was "doing great," and "coming along nicely with physical therapy." (*Id.*) In six weeks "he should have enough motion and strength to return to work . . . ." (*Id.*)

His final appointment, at the end of October, found him again "doing really well." (Tr. at 239.) He informed Dr. Mosier-LaClair that he had "retired" and asked for additional physical therapy. (*Id.*) His ankle was stable, he had no weakness or pain on resisted forefoot inversion and

eversion, his range of motion was almost completely normal, and there were no signs of posttraumatic osteoarthritis. (*Id.*) She refilled his Motrin prescription and told him to return as needed. (*Id.*)

Dr. J.L. Tofaute conducted an independent examination on March 2, 2010. (Tr. at 262-64.) Plaintiff reported "a slight limitation in [the] range of motion" in his ankle and decreased stamina. (Tr. at 262.) He stated he could stand for fifteen to twenty minutes without needing to lean on anything. (*Id.*) Sitting did not bother his ankle, but caused a sore back. (*Id.*) Walking caused pain on "bad days" and when he over-exerted himself. (Tr. at 262-63.) He also alleged that he limped, though according to Dr. Tofaute he had a normal gait and walked without an assistive device. (Tr. at 262-63, 266.) The "hardware" in his ankle–the screws and plate–sometimes irritated his skin. (Tr. at 263.) Climbing stairs required him to be conscious of his ankle. (*Id.*) Dr. Tofaute observed that he could squat, get on and off the examination table, and walk on his toes and heels. (*Id.*) His feet and lower legs had normal strength and range of motion, and he also had strong hand strength. (*Id.*) Finally, the "lower half of [his] left leg and ankle appeared slightly swollen." (*Id.*)

On July 22, 2010, Plaintiff asked Dr. Clifford M. Buchman to reevaluate his ankle. (Tr. at 296.) Dr. Buchman wrote to Plaintiff's attorney that Plaintiff reported fatigue, soreness, and difficulty descending stairs. (Tr. at 296.) Plaintiff could walk on his toes and heels, but had "pain to palpation," decreased range of motion, and "externally rotated . . . gait." (Tr. at 297.) X-rays showed the fracture had healed and that the "hardware" was not loosening.(*Id.*) But they also exhibited "some demineralization" and "early traumatic degenerative osteoarthritis. (*Id.*) The report from the radiologist did not note any signs of osteoarthritis. (Tr. at 300.) From his examination and the x-rays, Dr. Buchman concluded that Plaintiff could not engage in "productive

labor" because he could not stand or walk for prolonged periods or kneel, stoop, or squat. (*Id.*) "In all medical probability these restriction are permanent. Prognosis for his ankle remains extremely guarded." (*Id.*) Dr. Buchman recommended a home exercise program and prescribed ibuprofen. (*Id.*)

Plaintiff next saw Dr. Buchman nearly seven months later, on February 10, 2011. (Tr. at 302.) The ankle discomfort continued and Plaintiff reported slight swelling. (*Id.*) Dr. Buchman suggested he talk to Dr. Mosier-LaClair about removing the plate and screws. (Tr. at 303.) On August 15, 2011, Dr. Buchman filled in a one-page functional capacity sheet indicating that during an eight-hour workday, Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk for less than two hours, sit for less than six hours, and push or pull with his hands and feet without restriction. (Tr. at 305.)

After the hearing, on November 14, 2011, Plaintiff received a second independent evaluation. (Tr. at 307-20.) He told Dr. Asit K. Ray, the examiner, that he completed ten weeks of physical therapy. (Tr. at 307.) He further stated that he was independent in most personal care activities, could drive, and had no physical problems except for his ankle. (Tr. at 308.) Dr. Ray commented in the report that Plaintiff walked without limping or using an assistive device, and he could walk adequately on his heels and toes, squat, bend at the hips, and stand up independently. (*Id.*) His left ankle, which Plaintiff claimed was tender, was slightly swollen and had a larger circumference than his right, but his legs had normal strength. (Tr. at 309.) Aside from minor flexibility problems, Plaintiff completed all other physical tests with normal results. (Tr. at 308-20.) Dr. Ray concluded that Plaintiff could "perform his usual and customary activities including his occupational duties without any restrictions." (Tr. at 309.)

11

**b.**       **Mental Impairments**

Plaintiff also asserted that he suffered from depression and anxiety. (Tr. at 55-57.) On January 31, 2009, Plaintiff was arrested for driving under the influence ("DUI") after clipping another vehicle while attempting to pass it. (Tr. at 198.) He pled guilty, making this his third DUI charge. (Tr. at 44.) Shortly after these events, he sought treatment for the depression and anxiety they produced. On March 6, 2009, he told Dr. Snyder about the arrest and said "[h]e would like to be taking some medications for it." (Tr. at 235.) Dr. Snyder noted that Plaintiff "is under a lot of stress in relation to this" and diagnosed an adjustment reaction, (*Id.*), which is a "psychological response to an identifiable stressor or stressors . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 679 (4th ed., text rev. 2000) (hereinafter "DSM-IV-TR"). Plaintiff obtained a prescription for Zoloft, an anti-depressant. (Tr. at 235.)

Plaintiff completed a mental health questionnaire for Elonzo Duncan, a licensed counselor, on November 10, 2009. (Tr. at 255-57.) He listed one period of prior counseling from 2000, when the court handling one of his DUI arrests ordered him to attend therapy. (Tr. at 256.) His problems included legal matters, depression, alcohol use, headaches, and unhappiness. (Tr. at 256.) He was still taking Zoloft. (*Id.*) Notes from a counseling session on January 13, 2010–the first of three in the Record–indicated that Plaintiff's depression surrounded work and family issues. (Tr. at 258.) One week later, on January 20, Mr. Duncan added panic attacks, irritability, and paranoia to his assessment. (Tr. at 259.) Nothing new came out of the last session on February 8, 2009. (Tr. at 260.) Plaintiff testified at the hearing that he continued therapy with Mr. Duncan, (Tr. at 55-56,) but provided no additional records.

12

Plaintiff's only other mental health report came from an independent examination by Dr. Karen Marshall on March 10, 2010. (Tr. at 270-73.) Plaintiff reported that his anxiety intensified when he retired in August, 2009, because he lost his health benefits, workman's compensation, and income. (Tr. at 270.) The six weeks without income placed him in a precarious financial position: he sold his car and dining table, took high interest loans, and borrowed from friends. (Tr. at 271.) Physical symptoms included weight loss and insomnia. (Tr. at 270.) His daily activities involved cooking, performing chores, and helping take care of his mother. (Tr. at 271.) He followed political news and exercised his upper body. (*Id.*) His goddaughter helped with household chores and transportation. (*Id.*)

Dr. Marshall observed that despite Plaintiff's anxiety and restlessness, he expressed "an increase in hope. . . . that there may be a positive change" in his condition. (*Id.*) His mental activity appeared spontaneous and organized, and he could "understand, remember and complete simple and multi-step tasks in a supportive environment. It [would] be expected that his interactions with others will be appropriate." (Tr. at 272.) Dr. Marshall concluded that he could "handle workplace stress and conflict appropriately," and gave him a Global Assessment of Functioning score of fifty-eight.[2] (*Id.*) She diagnosed a mixed adjustment disorder, (Tr. at 278), estimated only mild limitations in daily living, social functioning, and mental clarity, (Tr. at 285), and determined the impairment was not severe. (Tr. at 275.)

c.     **Administrative Hearing**

At the hearing, Plaintiff testified that he earned a master's degree and had a license to teach in Michigan. (Tr. at 41.) He taught through the 2009 school year, (Tr. at 45), and the school district

---

[2] A GAF score of 58 indicates moderate symptoms, such as flat affect and circumstantial speech, or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, *supra*, at 34.

assigned him to a new position at a middle school starting in September 2009. (Tr. at 45-46.) The month before that year was to begin, Plaintiff decided that he "wasn't physically able to" work and instead retired. (Tr. at 46-47.)

He also discussed his ankle problems, stating that he could walk with pain for limited periods. (Tr. at 51.) The ankle break caused a misalignment, Dr. Buchman told him, which explained his hip and back pain. (*Id.*) His home exercise program included resistance exercises with rubber strips and took around thirty minutes to complete. (Tr. at 53.) He claimed to do twenty minutes of light walking each day. (Tr. at 54.) Both sitting and standing caused him frequently to shift his weight to avoid discomfort. (Tr. at 68.) His only medications at the time of the hearing were a prescription for Zoloft and another to treat an issue unrelated to his disability claim. (Tr. at 57.)

His goddaughter came over "almost daily" to help with chores. (Tr. at 59-60.) He had a second-floor apartment that appears to have required using stairs. (Tr. at 60.) He was an active reader and also followed sports and the news on television. (Tr. at 61-63.) He kept his driver's license but did not own a car; he stated that he moved to Flushing, Michigan because "everything [was] pretty much within walking distance . . . and that's kind of how I designed it."[3] (Tr. at 62.) Plaintiff testified that he frequently took his mother to the grocery store. (Tr. at 59.) He claimed to be sober since the night of his DUI, January 30, 2009. (Tr. at 64.) He also dined at restaurants, (Tr. at 61), and in his application notes mentioned attending the movies on a weekly basis. (Tr. at 183.) Finally, he explained that he could not work because he had "never respected or never known

---

[3] Plaintiff apparently moved from Flint to Flushing sometime after his accident. He listed his address in Flint on his paperwork through at least April, 2009, (Tr. at 236, 255) and provided an address in Flushing during the hearing, (Tr. at 39).

anybody who can teach sitting down," and he lacked the stamina to maintain school hours. (Tr. at 66-67.)

The ALJ then asked the vocational expert ("VE") at the hearing to analyze Plaintiff's past jobs under the Dictionary of Occupational Titles. (Tr. at 70.) The VE explained that both positions–assistant principal and teacher–were skilled occupations with light exertional levels. (*Id.*) The VE found that Plaintiff had the following transferrable job skills: managerial, communication, coordinating, computer, and organizational. (Tr. at 71.)

These skills could transfer to sedentary jobs, including admissions coordinator (3,800 positions in Michigan's lower peninsula), college registrar (3,850 in the lower peninsula), and educational program administrator (5,800 in the lower peninsula). (Tr. at 71-73.) The VE testified that these jobs remained available to an individual with Plaintiff's background, age, experience and other characteristics who "could not stand, walk, or be on their feet for prolonged periods of time and was unable to kneel, stoop, or squat," but had no other restrictions. (Tr. at 73.)

### F.  Analysis and Conclusions

### 1.  Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the residual functional capacity ("RFC") "to perform sedentary exertional work activities," with the additional restriction that he "could not stand, walk or be on his feet for prolonged periods of time." (Tr. at 24.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

15

20 C.F.R. § 404.1567(a). The ALJ also concluded that the claimant had acquired transferable skills from past relevant work. (Tr. at 27.)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's argument relies on a sleight of hand that moves so slowly he gives the trick away. Seeking the benefit of the burden-shift at stage five, Plaintiff criticizes the ALJ's hypothetical for inaccurately describing his impairments. (Doc. 8 at 8.) Because the Commissioner bears the burden of proving a significant number of jobs exists, an error in a hypothetical would stymie the Commissioner's case, not the Plaintiff's. (*Id.* at 7-8.) In essence, however, Plaintiff attacks the ALJ's RFC by proxy. But the RFC used at step five to formulate the hypothetical comes directly from the preceding four steps, where the burden rests squarely with the Plaintiff. 20 C.F.R. § 404.1560(c). Plaintiff's surface claim can thus be refuted simply by showing that the hypothetical accurately reflects the RFC without needing to show in addition that the RFC is accurate. Plaintiff's underlying claim–that the RFC is inaccurate–fails as well.[4]

---

[4] Plaintiff overlooks a stronger argument based on the ALJ's finding that he maintained transferable skills. Individuals over the age of fifty-five, the "advanced age" group, have skills transferable to sedentary work "only

### a.      Medical Sources, Plaintiff's Credibility, and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d).

---

if the sedentary work is so similar to [their] previous work that [they] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 C.F.R. § 404.1568(d)(4). Courts distinguish a skill from an aptitude by noting that the former is "a particular learned ability to do a specific job." *Richardson v. Sec. of Health & Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984). The ALJ can rely on testimony from the VE that the adjustment would be easy. *Crawford v. Sec. Health & Human Servs.*, 995 F.2d 1006, 1993 WL 205923, at *5-6 (6th Cir. 1993) (unpublished table decision).

It is unclear whether the ALJ must explicitly discuss this in his written decision. The usual mistakes in ALJ opinions in this situation deal are conflating aptitudes and skills and ignoring the significant difference between the suggested and past jobs. *See Bliss v. Sec. of Health & Human Servs.*, 798 F.2d 1413, 1986 WL 17232, at * 2 (6th Cir. 1986) (unpublished table opinion); *Ellington v. Sec. of Health & Human Servs.*, 738 F.2d 159, 159-60 (6th Cir. 1984); *Richardson*, 735 F.2d at 964; *Blake v. Sec. of Health & Human Servs.*, 528 F. Supp. 881, 884-86 (E.D. Mich. 1981). In contrast, the Sixth Circuit has not remanded when the ALJ's decision fails to discuss aspects of the skills, even where the Social Security Rulings seem to require it. *Wilson*, 378 F.3d at 548-50 (finding that the ALJ adequately discussed the skills even though he failed to identify them and SSR 82-41, 1982 WL 31389, at *7, stated that "the acquired work skills must be identified"). In another case, the court stated that "'transferability of skills depends largely on the similarity of work activities among the previous and suggested jobs.'" *Kappesser v. Comm'r of Soc. Sec.*, 69 F.3d 537, 1995 WL 631430, at *3 (6th Cir. 1995) (unpublished table decision) (quoting *Burton v. Sec. of Health & Human Servs.*, 893 F.2d 821, 823 (6th Cir. 1990)). The ALJ there correctly found transferability and little adjustment because the VE testified about the suggested positions and the record contained descriptions of claimant's past jobs. *Id.* Finally, the Commissioner has noted that "[u]sually the higher the skill level, the more the potential for transferring skills increases." SSR 82-41, 1982 WL 31389, at *4.

Here, the ALJ did not explicitly address the vocational adjustment but adequately considered it nonetheless. He inquired into Plaintiff's education, which included a graduate degree and additional graduate credits. (Tr. at 41.) The Record also contained evidence of Plaintiff's substantial work history. (Tr. at 153-54, 159-60, 162-63, 171-73.) He had experience in administration, as well as management, scheduling, staffing, evaluating subordinates, developing curricula, regulatory compliance, recruiting students, teaching, and security. (*Id.*) His cognitive abilities remained intact and he stated that he handled stress well. (Tr. at 184-85.) The ALJ confirmed with the VE at the hearing that all of the past and potential jobs were within the educational field. (Tr. at 70-73.) Thus, the ALJ could reasonably conclude the skills would transfer with little vocational adjustment.

There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from non-treating acceptable sources, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Finally, the social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

---

[5] The Commissioner's power to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

While "'objective evidence of the pain itself'" is not required. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four

stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

### b.  Analysis

Plaintiff argues that the hypothetical did not reflect his actual impairments, and consequently the Commissioner erred in relying on it to meet his stage-five burden of proof. (Doc. 8 at 7.) His discussion of the relevant law begins by asserting that hypotheticals must accurately encompass all impairments. (*Id.* at 7.) He then covers, in one page, the law at the core of his contention by describing treating sources and RFC requirements. (*Id.* at 9.) Shifting to the analysis, he first adduces three pieces of evidence to prove the RFC was flawed: his hearing testimony, his exercise program, and Dr. Buchman's restrictions. (*Id.* at 9-10.) The bulk of his argument–indeed, the entirety of it–states that

> [f]inding . . . Mr. Costello was capable of performing the positions of admissions coordinator, education program administrator, or a registrar in a college setting, while he continuously requires the need to perform home exercises for 15-30 minutes at a time is erroneous. (Tr. 53) These would also require him to be on his feet for unknown periods of time. He can't do this. To subject Mr. Costello to perform these positions subjects him to further injury. Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified, it's inhumane. The limitations that Mr. Costello faces effectively preclude

him from performing any work, including the listed representative occupations, and the reasoning to support his lack of credibility is no substantiated.

More so, the hypothetical question asked of the VE included claimant's education and work experience with him being able of performing a range of sedentary work with additional limitations of no standing, walking, or being on feet for prolonged periods of time, and is unable to kneel, stoop, or squat is improper. (Tr. 73) Mr. Costello indicated that he cannot stand, walk, or be on his feet for prolonged periods of time. (Tr. 54) How can a person who cannot be on their feet possibly be expected to perform any of these positions? They can't. Mr. Costello could not engage in any type of job where it entails being on the feet for unknown periods of time, or which would preclude him from performing his home exercises. The hypothetical is improper.

Mr. Costello was incapable of performing even these sedentary jobs. Each of these jobs, as expected, requires the need to be on his feet for unknown periods of time, and to do so would cause further or more prolonged damage.

(Doc. 8 at 10.)

This fails to persuade for multiple reasons. First, it contains ambiguities and errors on its face. Plaintiff suggests the exercise program precludes work because he must do it "continuously" for fifteen to thirty minutes "at a time." (*Id.*) This could mean one of three things: (1) he always has the need to exercise; (2) he must exercise "continuously," which literally means without break; or (3) he must exercise "continually," which allows for brief breaks. Bryan A. Garner, *Garner's Modern American Usage* 197 (3d. ed. 2009). The first says nothing about the length or frequency of the programs, and would not necessarily prevent work. The second and third constructions produce absurd results. And none of them represent the actual thirty-minute per day program Dr. Buchman recommended. (Tr. at 54.)

Plaintiff also notes that the hypothetical limited him to jobs without prolonged standing or walking. (Doc. 8 at 10.) He counters this by pointing to his testimony claiming that he cannot stand or walk for prolonged periods, and concludes that he is incapable of doing jobs without such

requirements. (*Id.*) The testimony supports rather than contradicts the ALJ's hypothetical. The ALJ does not make him go beyond the limitations he asserts.

Second, the argument is ultimately aimed at the RFC rather than the hypothetical, and thus Plaintiff carried the burden of proof. The errors Plaintiff finds in the hypothetical deal with its lack of restrictions. (*Id.*) The restrictions employed in the hypothetical come from the RFC developed at steps one through four. 20 C.F.R. § 404.1560(c). At step five, the Commissioner is "not responsible for providing additional evidence about [the claimant's] residual functional capacity . . . ." *Id.* § 404.1560(c). This mistake is largely irrelevant to the analysis here because, under any interpretation, Plaintiff failed to meet his burden and the Commissioner met hers.

Finally, and most importantly, substantial evidence supported the ALJ's findings.[6] Plaintiff did not link any of the evidence he cites to relevant legal standards. For example, he never explains how the treating source rules affect the case. In contrast, the ALJ appropriately evaluated the medical sources and weighed Plaintiff's subjective complaints. He described the length and nature of Plaintiff's relationship with Dr. Snyder, and noted the lack of current information from that source. (Tr. at 20.) He also properly diminished the value of Dr. Buchman's conclusions, which came after only two appointments and included only conservative treatments. (Tr. at 20-21.) He ever prescribed an assistive device, and told Plaintiff to stay relatively active. (Tr. at 20-21.) His treatment notes contained evidence contradicting his conclusions, such as Plaintiff's somewhat

---

[6] The ALJ found that Plaintiff's mental impairment was not "severe" under 20 C.F.R. 404.1520(c). (Tr. at 20-22.) Plaintiff does not dispute this finding. Nor could he. The evidence substantially supports the ALJ. Plaintiff obtained his Zoloft prescription after one meeting with his physician. (Tr. at 22.) The Record contains only a few notes from his counselor, who was not an acceptable medical source. 20 C.F.R. § 404.1513. (Tr. at 21.) Plaintiff never contended that he had any serious cognitive or social limitations. (Tr. at 22-23.) And his symptoms developed from temporary circumstances, such as his arrest and financial problems. (Tr. at 22, 270.)

23

normal gait and heel and toe walking. (Tr. at 20, 26.) Some of his other opinions appeared to come from Plaintiff's subjective complaints rather than firsthand observations. (Tr. at 26.)

Moreover, other source opinions controverted Dr. Buchman's opinion. Dr. Mosier-LaClair consistently characterized Plaintiff's recovery as "great" and found almost normal strength and motion. (Tr. at 239-44.) She prescribed Motrin and other painkillers, (Tr. at 219, 239), but at the time of the hearing Plaintiff was not taking any medication for his ankle or hip pain. (Tr. at 57, 205.) Two independent evaluations described his normal gait and strength. (Tr. at 262-63, 266, 307-20.)

The ALJ also sufficiently assessed Plaintiff's credibility. The Record displayed "a history of significant left ankle fracture," substantiating some of the complaints. (Tr. at 25.) Yet, objective evidence did not establish the severity claimed and, instead, demonstrated that Plaintiff had substantially normal strength and range of motion in his lower extremities. (*Id.*) The ALJ also investigated the factors in 20 C.F.R. § 404.1527. (*Id.*) Plaintiff performed regular activities and, in fact, he moved near shopping areas when he sold his car after his injury so that walking could become his main mode of transportation. (Tr. 25, 63, 271.) He handled his finances, spent time with friends, worked out, and occasionally helped his elderly mother. (Tr. at 25, 180-85.) The treatments were also relatively conservative. His surgeon concluded that he responded well to the surgery and provided him with a limited prescription for pain medication and a temporary cast. (Tr. at 239-44.) He received no other treatment for his ankle or hip pain and walked without an assistive device. (Tr. at 20, 21, 25.) The ALJ reasonably concluded that, in light of his limitations and skills, he could complete a limited range sedentary work. (Tr. at 18, 28.)

I therefore suggest that the ALJ's findings that Plaintiff is not disabled is supported by substantial evidence and should not be disturbed.

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 17, 2014                    /S Patricia T. Morris
                                        Patricia T. Morris
                                        United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  June 17, 2014                    By   S/  Alex Gallucci
                                        Law Clerk to Magistrate Judge Morris